[Cite as *State v. Harris*, 2024-Ohio-1579.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                       No. 112269

    v.                            :

KIELONTE HARRIS,                        :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 25, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-646006-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrew F. Rogalski and Nora Bryan, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Kielonte Harris ("Kielonte"), appeals his convictions for aggravated murder, murder, aggravated burglary, aggravated

robbery, kidnapping, felonious assault, and having a weapon while under disability.[1] For the reasons set forth below, we affirm Kielonte's convictions.

## I. Facts and Procedural History

{¶ 2} In December 2019, Kielonte and codefendant, Deandre Harris ("Deandre"), were charged in a 19-count indictment involving the deaths of April Magana ("Magana"), Muriel Tursivio ("Tursivio"), and Joseph Meeks, III ("Meeks"). Counts 1 and 2 charged each of them with the aggravated murder of Magana. Counts 3 and 4 charged them with the aggravated murder of Tursivio. Counts 5 and 6 charged them with the aggravated murder of Meeks. The aggravated murder charges in Counts 1-6 each contained a reservation of "the right to seek a superseding indictment containing the appropriate [R.C.] 2929.04(A) Aggravating Circumstance(s)/Specification(s)." Count 7 charged them with the aggravated burglary of Magana, Tursivio, and Meeks. Count 8 charged them with the aggravated robbery of Magana, Tursivio, and Meeks. Count 9 charged them with the kidnapping of Magana, Tursivio, and Meeks. Counts 10-12 charged them, respectively, with the murder of Magana, Tursivio, and Meeks.[2] Counts 13-15 charged them, respectively, with the felonious assault of Magana, Tursivio, and

---

[1] This appeal is a companion appeal to codefendant, Deandre Harris, in *State v. Harris*, 8th Dist. Cuyahoga No. 112195, 2024-Ohio-961.

[2] Each of Counts 1-12 carried a one- and three-year firearm specification, two 54-month firearm specifications, and notice of prior conviction and repeat violent offender specifications for both Kielonte and Deandre.

Meeks.[3] Counts 16-17 charged Kielonte with having a weapon while under disability ("HWWUD"). Counts 18-19 charged Deandre with HWWUD.[4]

{¶ 3} The charges stem from allegations that Kielonte shot and killed Magana, Tursivio, and Meeks within a span of minutes around 4:00 a.m. on November 2, 2019. Magana died instantly from a gunshot wound to her right temple. Tursivio died at the hospital from a gunshot wound to her left eye. Meeks died instantly from a gunshot wound to his left temple.

{¶ 4} On January 28, 2020, the state reindicted Kielonte in *State v. Harris*, Cuyahoga C.P. No. CR-20-648070 for the same charges, but added aggravating circumstances specifications to each of the aggravated murder charges. Prior to trial, the state chose not to pursue the death penalty and that case was dismissed on October 19, 2022. The matter before us proceeded to a jury trial the same day. The following evidence was adduced at the joint trial.[5]

{¶ 5} The video footage captured by surveillance cameras and the testimony elicited from several witnesses at trial are relatively consistent. Surveillance footage from Izzo's Café reveals that during the early morning hours of November 2, 2019, Kielonte, Deandre, and a third male can be observed arriving at

---

[3] Each of Counts 13-15 carried a one- and three-year firearm specification, two 18-month firearm specifications, two 54-month firearm specifications, and notice of prior conviction and repeat violent offender specifications for both Kielonte and Deandre.

[4] Each of Counts 16-19 carried a one- and three-year firearm specification, an 18-month firearm specification, and a 54-month firearm specification.

[5] Kielonte elected to have Counts 16 and 17, and the 18-month and 54-month firearm specifications tried before the bench.

Izzo's Café. Kielonte admitted in his arrest interview that he was at Izzo's Café at that time. Kielonte was wearing a black puffy jacket with a red emblem, black and white shoes, and distinctive pants with white-colored patterns on both the back and front leg and thigh areas. The same three individuals left Izzo's Café together approximately 30 minutes later.

{¶ 6} Meanwhile, Magana was hosting a party at her apartment on Lorain Avenue. Surveillance video from the intersection of West 78th Street and Lorain captured the outside of Magana's apartment. Multiple individuals can be observed going and coming from the back stairs of the apartment throughout the night and early morning hours of November 2, 2019. At 3:12 a.m., three individuals appear on surveillance footage walking southbound on West 78th Street towards Magana's apartment. At approximately the same time, the GPS location from Kielonte's ankle monitor placed him at that general location. In addition, one of the three individuals walking toward Magana's apartment can be observed wearing pants with white markings, similar to the ones worn by Kielonte at Izzo's Café. GPS positioning verified that Kielonte remained either inside or just outside of Magana's apartment until about 4:00 a.m., which was just after the three murders occurred.

{¶ 7} Several eyewitnesses testified at trial. Leila Abdulhalim ("Abdulhalim") testified that she attended Magana's party on November 2, 2019, to celebrate "Smooth's" birthday. Smooth was later identified as Arsenio Coley ("Coley"). Abdulhalim knew Magana because Abdulhalim used to buy drugs from Magana. According to Abdulhalim, she was addicted to drugs at that time and would

perform sex acts in exchange for money to buy drugs. On the night in question, Abdulhalim planned on buying drugs from Magana. Abdulhalim attended the party with her best friend "Muriel" and friend "Red." "Muriel" was later identified as Tursivio and "Red" was later identified as Meeks. Abdulhalim testified that Weaver Jones a.k.a. "Dutch" was also in attendance with his girlfriend, Erica Vaultman ("Erica"). They lived in a room at Magana's apartment. Abdulhalim further testified that Casey Holbert ("Holbert") was at the party. According to Abdulhalim, Holbert referred to Magana as "mom" because Magana was her "street mom." (Tr. 903-904.)

{¶ 8} As Abdulhalim was walking to Magana's apartment, Kielonte called out to her from a blue car, wanting her to buy drugs from him. Abdulhalim testified that Kielonte was also called "K," "Little Man," and "Shorty." (Tr. 906.) Abdulhalim approached the car and observed "Love" in the driver's seat. She described him as "a heavy-set guy." (Tr. 924.) "Love" was later identified as David Billingsley ("Billingsley"). Abdulhalim declined to buy drugs from Kielonte because she already planned to buy from Magana. Kielonte followed Abdulhalim upstairs to Magana's apartment. Kielonte continued "hassling" her in the apartment, so "Dutch" told her to "go in the back room." (Tr. 911.) Abdulhalim testified:

> And as I was trying to go into the back room, Kielonte pulled out a gun. I was right by April. And he told everybody to strip. And they were arguing back and forth. April told him, you are going to bring a gun in my house, you better got the balls to use it. And she licked the tip of the gun. And the next thing I know, the bullet went past my face and hit her right in the head. And I took off.

(Tr. 911.)

{¶ 9} Everybody ran out of the apartment after Kielonte shot Magana. Abdulhalim testified that Kielonte was behind her. Abdulhalim ran down the steps and observed Meeks in the alley. Meeks and Kielonte were arguing. Meeks confronted Kielonte about shooting Magana. Abdulhalim heard a gunshot as she ran across the street, and she observed Meeks fall to the ground. Kielonte was standing next to Meeks at the time, still holding a gun. She ran across the street to a friend's house. There was a male at that house who went to check on Tursivio's whereabouts. Upon the male's return, he informed Abdulhalim that Tursivio was shot.

{¶ 10} The surveillance video from Lorain Avenue was then played for the jury. In the video, Abdulhalim can be observed getting out of a white vehicle near Magana's apartment. Abdulhalim heard her named called as she was walking to the apartment so she went over to the blue car parked by a boat in the alley. Abdulhalim encountered Kielonte and Billingsley in the car. Minutes later numerous people can be observed running from the apartment. Abdulhalim can be observed on the sidewalk at around 3:57 a.m. and Meeks was identified as the man in the blue and white shirt. Kielonte and Meeks can be observed arguing. Abdulhalim then turned around and observed Meeks fall and Kielonte holding a gun. In the video, the shooter can be observed wearing distinctive black pants with white-colored patterns on both the front and back legs. Abdulhalim acknowledged that she was not truthful

with the police initially because she was afraid of getting in trouble for "doing drugs and prostituting." (Tr. 919.)

{¶ 11} On cross-examination, Abdulhalim testified that she was high when she spoke with the police. She stated, "I don't know what I told the police at the time because I was high as a kite." (Tr. 942-943.) When asked to describe the shooter, Abdulhalim stated that he was a "[s]hort, young black man in a jacket" and skinny with braids. (Tr. 971.)

{¶ 12} When asked to identify Kielonte (the shooter) in the courtroom on direct examination, Abdulhalim initially pointed to Deandre. She then stated that she may be mistaken. When she observed the codefendants standing next to each other, Abdulhalim corrected herself and identified Kielonte as the person in the blue shirt and Deandre in the pink suit. Abdulhalim stated that she has seen Deandre before, but does not "know him, know him." (Tr. 909.) On cross-examination, Abdulhalim testified that she did not know if she has ever seen Deandre before.

{¶ 13} Billingsley initially refused to answer any questions when he was called to testify. The court then held Billingsley in contempt and he was taken into custody. As a result of this, Kielonte moved the court for a mistrial, which the trial court denied.[6] Billingsley was then recalled to testify later in the trial. He testified that people call him "Love," which is his middle name. On the night in question, Billingsley drove "Dutch" to buy a six-pack of beer and then parked near Magana's

---

[6] Deandre joined in the motion for mistrial.

apartment, where he and "Dutch" listened to music and drank in his car. He was parked in a driveway behind Magana's apartment and next to a field, which had six boats in it. Billingsley testified that while they were in his car, Kielonte and his friend walked by and waved at them. According to Billingsley, he knows Kielonte socially. Kielonte and his friend went upstairs to Magana's apartment. A few minutes later, "Dutch" exited Billingsley's car and went up to the apartment to check on Erica.

{¶ 14} Billingsley waited for "Dutch" to return. In the interim, Kielonte left the apartment and walked to Billingsley's car. He asked Billingsley for a ride to the east side. Billingsley agreed, and Kielonte got in the car. The two men sat in the car for a few minutes while Billingsley continued drinking his beer. At that time, Abdulhalim walked past them. Kielonte told Billingsley that Abdulhalim owed him money. Kielonte opened the car door and called her name. Billingsley testified that she then looked back at Kielonte "with a little smug look," turned around, and continued to walk upstairs to Magana's apartment. (Tr. 1133.) Kielonte told Billingsley that he "will be right back, man. Let me go holler at her real quick. She owe me some money." (Tr. 1134.)

{¶ 15} Kielonte followed Abdulhalim to Magana's apartment, leaving Billingsley in his car. Approximately 15 minutes later, Billingsley observed the door open and several people exited the apartment at a "rapid pace." (Tr. 1135.) Billingsley asked "one of his boys" who walked by what was going on, but he did not "even look at [Billingsley]." (Tr. 1135.) Tursivio then ran up to his car asking if she could get in with him. He agreed, but before she could get in the car, Kielonte's

friend asked could "I get in, too, bro." (Tr. 1141.) Billingsley replied, "I don't care" and then the friend "hurried up and got in." (Tr. 1141.) Billingsley's car was only a two-door, which left Tursivio standing outside the car.

{¶ 16} Moments later, Kielonte came towards Billingsley's car. Billingsley testified that Kielonte walked near the car but then he could no longer see him because "it's real dark inside of [his] car." (Tr. 1142.) Billingsley then heard a gunshot, which sounded as though it came from the side of his car. At that point, Billingsley "cranked [his] car up, * * * put it in drive, [and] got ready to pull out." (Tr. 1142.) He observed Kielonte leaving the alley, going left towards "Colgate." (Tr. 1144.) Billingsley tried to pull out to the right, towards Lorain Avenue, but there was a body on the ground. So, he backed up and went to the left instead. Kielonte's friend told him to turn down an alley. As they were driving down the alley, the friend instructed him to stop the car. The friend opened his car door and Kielonte jumped in the car. Kielonte and the friend asked if Billingsley could drive them to the east side. Billingsley declined and offered them a ride back to his house. According to Billingsley, they "probably hit a freeway," and that "it was fast moving that night." (Tr. 1147.) Billingsley testified that during the car ride, he heard somebody say "we should have taken care of homeboy or something like." (Tr. 1171.) Billingsley believed that he observed Kielonte's friend cleaning or wiping a gun that night.

{¶ 17} Within minutes after arriving at his home, Billingsley left, telling Kielonte and his friend that he was going for cigarettes. When he returned home 20

minutes later, Kielonte and his friend were gone. He did not learn until the next day that Tursivio and Meeks were shot and killed.

{¶ 18} Coley testified that his nickname is "Smooth." He admitted to using various drugs for over ten years. Coley testified that they were celebrating his birthday on the night of the shootings. Coley knew Magana because they used to do drugs together. Coley testified that the people at the party were "[g]etting high, * * * smoking crack, [and] having sex." (Tr. 695.) He knew several of the people there, including "Dutch" and his girlfriend. Coley further testified that he "didn't really see anything." (Tr. 698.) He was in another room when it happened and jumped out of the window after the "[b]ullets went off." (Tr. 697.) Coley was under the influence of drugs, stating that he was hallucinating and was "probably up for like three days at that time." (Tr. 696.)

{¶ 19} Coley did not provide specific answers to the questions about what occurred and initially denied that he called 911 or that he knew who shot Magana. Coley's 911 call was then played for the jury. Coley made the call around 8 o' clock the morning of the shootings. On the call, Coley stated that "Tae" shot his best friend Magana in her house — "he shot her like she wasn't shit." (state's exhibit No. 216.) He further stated, "[T]hat shit happened right in front of me." (state's exhibit No. 216.) He also stated, "I'm one of the ones that got out the house that didn't die. So, he was trying to kill everybody in the house because they was witnesses." (state's exhibit No. 216.) Regarding Meeks, Coley stated, "[M]y dude [Meeks], he killed [Meeks], he was lying right in the middle of the alley." (state's exhibit No. 216.)

{¶ 20}Holbert testified that she was 17 years old on November 2, 2019. Magana was "like a mother" to her and the two of them knew each other Holbert's entire life. (Tr. 1384.) Holbert knew Kielonte as "Little Tae." (Tr. 1391.) They used to be very close, and she considered him to be like a brother. Holbert further testified that "Dutch" and "Erica" stayed in one of the bedrooms of Magana's apartment. Holbert testified that she attended Coley's birthday party.

{¶ 21} Earlier that evening, Holbert observed Kielonte and some other people walking around at a gas station. Holbert learned that one of the people walking around with Kielonte goes by "D-man," whom she identified as Deandre. She had never seen Deandre before that night. At some point that evening, Deandre entered Magana's apartment with "multiple people" whom she did not know. Holbert observed a gun on Deandre's hip when he entered the apartment. At some point during the party, she observed Deandre put the gun "inside his coat pocket." Holbert testified that an argument over money "broke out" in the living room. Abdulhalim and Kielonte were involved in the argument. Holbert heard Kielonte say "how he was going to take people's money." (Tr. 1397.) In response, Magana said, "[G]et out of my house." (Tr. 1397.)

{¶ 22} Holbert went into the kitchen as the argument "just got louder and louder." Deandre was also in the kitchen. Holbert then heard gunshots in the living room. She testified that she could not observe the argument from the kitchen and does not know "who shot who." (Tr. 1397.) While the gunshots are being fired, Deandre grabbed Holbert's hair "from the back" and began pulling her, trying to get

out of the apartment. (Tr. 1398.) She exited the apartment and ran to her sister's house. As she headed to her sister's house, Holbert heard gunshots outside the apartment. She looked back and observed a body on the ground. Holbert further testified that she knew Meeks and he hung out in the alley outside Magana's apartment. She observed Meeks outside the apartment on the night of the shooting. Holbert admitted that when she was initially interviewed by police, she lied because she "was scared for [her] life." (Tr. 1405.)

{¶ 23} Cleveland Police and EMS responded to the scene. Cleveland Police Officer Lance Estergall ("Officer Estergall") observed a male, later identified as Meeks, lying in the street, apparently deceased.[7] Cleveland Paramedic Gregory Hyde ("Paramedic Hyde") examined Meeks and pronounced him dead. Officer Estergall and other police officers found a woman in the apartment, later identified as Magana, who also appeared to be deceased. Cleveland Police Officer Daniel Florentz described Magana as deceased with a gunshot wound and "drugs" around the victim. Officer Estergall stated that at some point while securing the scene, officers discovered a second woman who had been shot outside the apartment. Paramedic Hyde testified that he approached a second person, later identified as Tursivio, between some boat trailers in the back parking lot area. Paramedic Hyde further testified that Tursivio had a gunshot wound to the head and was "not responsive to anything but pain." (Tr. 1202.) She was breathing, but was not moving

---

[7] At the time of trial, Estergall testified that he has been a detective for two years.

one side of her body. Paramedics transported her to MetroHealth hospital. According to Paramedic Hyde, Tursivio was alive when they arrived at the hospital. He learned that she passed away at the hospital.

{¶ 24} Cleveland Police Detective Arthur Echols ("Det. Echols") testified that he responded to the crime scene at West 78th Street and Lorain Avenue on November 2, 2019. Det. Echols testified that he interviewed "Dutch" and Erica and he also interviewed Coley, who drove himself to the police station later that morning to provide information about the shootings. From the interviews, police identified Kielonte as a person of interest in the shootings. Police then contacted the Adult Parole Authority and learned that Kielonte's ankle monitor was in the area of the crime scene around the time of the murders. Police then obtained an arrest warrant for Kielonte and effectuated Kielonte's arrest that day at Sandusky Avenue based on the ankle monitor information.

{¶ 25} Detective Echols and Cleveland Police Sergeant Aaron Reese interviewed Kielonte. Portions of the interview were played for the jury. In the interview, Kielonte admitted that he was at Izzo's earlier that morning and that between 3:00 a.m. and 4:00 a.m., he was hanging out on West 78th Street and Lorain Avenue. Kielonte also admitted to being inside Magana's apartment earlier on November 1, 2019, but denied being inside when the shooting occurred. He also denied being around a firearm.

{¶ 26} Based on the interview, officers obtained surveillance video from Izzo's. Det. Echols testified that he could observe Kielonte on that video. When

asked if there was anything that Kielonte was wearing that stood out, Det. Echols replied, "The black coat that he had on. It had I believe a hood on it and I also had a logo, left breast area of the coat. And he also had on some athletic shoes. They looked like Jordans." (Tr. 1618.) On cross-examination, Detective Echols admitted that the initial description they were provided was that the shooter had braided hair. Kielonte, however, did not have braided hair in the surveillance videos or when he was interviewed after his arrest on the day of the shooting.

{¶ 27} Darren Robinson ("Robinson") testified that he recently retired from the Cleveland Police Department where he served as a detective for over 20 years, including on November 2, 2019. Robinson took photographs and collected evidence from the house on Sandusky Avenue where Kielonte was arrested. The evidence included a pair of "black and white Jordan 23 tennis shoes" and a "black Levi jacket or coat." (Tr. 1360, 1363.) Robinson swabbed both the Levi's coat and the Jordan shoes for DNA. On cross-examination, Robinson admitted that the officers did not find a firearm or any ammunition during their search of the Sandusky home.

{¶ 28} Jeremy Ice ("Ice"), a parole officer with the Ohio Adult Parole Authority, testified that Cleveland police officers asked him to run a "proximity report" for a specific address and time to identify if any supervisee with an ankle monitor was in that area at the time. Ice's report revealed that one supervisee was in the area at that time. Ice identified the supervisee as Kielonte.[8] Ice then provided

_____

[8] The parties stipulated that Kielonte was on postrelease control on November 2, 2019, monitored with a GPS ankle monitor.

real-time tracking information to law enforcement officers, who arrested Kielonte at a house on Sandusky Avenue in Cleveland on November 2, 2019.

{¶ 29} David Scheppegrell ("Scheppegrell"), a senior vice president with Sentinel Offender Services, testified that Omnilink, a subsidiary of Sentinel, manufactures ankle monitors and contracts with government agencies to provide technology and related services. The parties stipulated to Scheppegrell being an expert in offender tracking. Scheppegrell testified that he reviewed the data from Kielonte's ankle monitor for November 2, 2019. He mapped the location points in relation to the crime scene — 7802 Lorain Avenue in Cleveland. Scheppegrell testified that based on his analysis of the data, he concluded that Kielonte's ankle monitor was within Magana's apartment building "for at least part of the time" between 3:00 a.m. and 4:00 a.m. on November 2, 2019. (Tr. 1316.)

{¶ 30} The data points from Scheppegrell's data report placed Kielonte at locations that correspond with the surveillance video and corroborate eyewitness testimony. For instance, when Abdulhalim arrived at Magana's apartment at around 3:50 a.m., the GPS data reveals that Kielonte was in the exact location of where Billingsley's vehicle was parked. And at approximately 3:58 a.m., the data has Kielonte on Colgate, which was seconds before the surveillance video depicts Billingsley's vehicle exit the lot and turn west on Colgate, where Billingsley testified that Kielonte entered his car. From this point, the data placed Kielonte on Interstate 90, traveling at speeds up to 92 miles per hour. Then at 4:07 a.m., the data placed Kielonte at the housing projects where Billingsley lived, just as Billingsley testified.

Over the next few hours, Kielonte arrived and remained on Sandusky Avenue on Cleveland's east side, where police arrested him later that same day.

{¶ 31} Tom Ciula ("Ciula"), a forensic video specialist, who has been with the Cleveland Police for 11 years, testified that he analyzed the surveillance video from a building across the street from the murder scene and Izzo's to "see if there were any similarities" between people at the murder scene and at Izzo's. (Tr. 1025.) As part of his analysis, Ciula enlarged the videos, enhanced them, created video sequences, and created a comparison video. Ciula testified that if he observes things that he believes are consistent, he will sometimes put them into a single video. The videos were played for the jury, and Ciula described what he observed. He indicated that three people arrived at Izzo's at approximately 1:51 a.m. One of them wore pants with a distinctive pattern consisting of two lighter areas on the front of each leg. The pants also had two lighter areas on the back on each leg. Regarding the Lorain video, Ciula testified that at 3:56 a.m., an individual who started at that upper center frame area can be seen coming all the way down to Lorain and is on the corner. Other individuals can also be seen in the center area. "An individual in a striped shirt is seen coming from behind the building with his arms raised. What appears to be a scuffle breaks out. The muzzle flash is seen and the individual in the striped shirt is on the ground." (Tr. 1035.) Ciula further testified that the individual in the video next to the individual with the blue striped shirt had dark-colored clothing. According to Ciula, it was apparent that this individual had light areas on their jeans — "two on each leg from the back from behind." (Tr. 1042.)

{¶ 32} On cross-examination, Ciula acknowledged that the white insignia on one of the coats seen at Izzo's is not seen on the individual in the Lorain video. Ciula explained that the insignia was not observable "because of the distance from the camera." (Tr. 1101.) He further acknowledged that two individuals on the Lorain video can be observed with similar white markings on their jeans and other individuals can be observed wearing black jackets. While Ciula acknowledged that he is not an expert on denim patterns, he stated that "I am an expert on what is captured on a DVR visually, what's captured on a camera." (Tr. 1105.)

{¶ 33} Dr. Thomas Gilson, M.D. ("Dr. Gilson"), a forensic pathologist and medical examiner for Cuyahoga County, testified that he conducted the investigations into the deaths of Magana, Meeks, and Tursivio. Dr. Gilson was on the scene and found Magana deceased in her apartment with a plastic baggy containing white powder in her hand. Dr. Gilson testified that Magana had been shot in the right temple, which caused injuries to her brain and skull and killed her. Dr. Gilson stated that Magana had stippling on her scalp, which indicated that the gun "was somewhere between, you know, five to 7 inches away and probably no more than 18 to 24 inches [away]" from Magana when she was shot. (Tr. 781.) Dr. Gilson testified that Meeks was found deceased, "laying on the ground, [with] blood around his head." (Tr. 788.) Dr. Gilson stated that Meeks had been shot in the left temple area, which caused injuries to his brain and skull and killed him. Dr. Gilson did not observe Tursivio at the scene because she was transported to the hospital. He learned that she passed away a few hours after arriving at the hospital. According

to Dr. Gilson, Tursivio was shot in the left eye, causing injuries to her brain and skull and killing her. Toxicology testing revealed that Magana, Meeks and Tursivio had all been under the influence of cocaine when they were killed.

{¶ 34} Kristen Koeth, a firearm and tool mark examiner in the firearms section of the Cuyahoga County Regional Forensics Science Laboratory, testified that she examined the three 9 mm cartridge cases recovered from the crime scene. Based on her examination, she concluded that the three cartridge cases were fired from the same 9 mm handgun.

{¶ 35} Lisa Przepyszny ("Przepyszny"), a forensic scientist in the trace evidence department at the Cuyahoga County Regional Forensic Science Laboratory, testified that based on her examination of a red hat worn by Meeks when he was shot, she determined that the gun that killed him was at least four or five feet away and could have been farther from him when it was fired. Przepyszny also examined the "black Jordan shoes" and "black Levi's coat" recovered from the Sandusky Avenue house. Kielonte's DNA was present on both of these items. Przepyszny testified that she found two particles that were characteristic of gunshot residue on the lower sleeves of the coat. She concluded that either the sleeves were in proximity of a fired gun or gunshot residue transferred from an object to the sleeves. On cross-examination, Przepyszny admitted that there are many ways that gunshot residue can transfer onto clothing, in addition to physically handling or manipulating a firearm. On redirect, Przepyszny testified that it would be

reasonably possible for gunshot residue to land on people located within "several feet" of a fired gun. (Tr. 1487.)

{¶ 36} Jeff Oblock, a DNA analyst at the Cuyahoga County Regional Forensic Science Laboratory, testified that he performed DNA analysis on swabs taken from the bodies of the three victims in the case and compared those with samples from Kielonte and Deandre. Neither Kielonte's nor Deandre's DNA was found on any of the victims, on the cartridge or cartridge cases recovered from the crime scene, nor in Billingsley's car. Also, their DNA was not found on other items the crime scene, including a glove, a cigar tip, or a cigarette lighter. The DNA on the Levi coat matched to Kielonte and one unknown contributor. The DNA on the Jordan shoes matched to Kielonte and two unknown contributors.

{¶ 37} During jury deliberations, it came to the court's and parties' attention that the jury was inadvertently provided with a flash drive that contained contents that were not exhibits ("Court's Ex. 5"). As the court explained, the court's scheduler "inadvertently grabbed that flash drive" and included it with the box of evidence that was provided to the jury. (Tr. 1896.) The flash drive, provided by the defense, "contained various bits of information, mostly documentary information relative to the capital portion of the case." (Tr. 1895.) The jury foreperson wrote a letter to the court stating that there were no videos contained on the drive when the jury attempted to view it. (Tr. 1896-97.) The court's bailiff retrieved the computer along with the flash drive and the court decided to question Juror No. 7, who the bailiff observed operating the computer. Juror No. 7 stated that he opened the flash drive

to search for video files, but only found text and PDF files. While he opened one file, Juror No. 7 stated that he "didn't read anything on it" or remember the content of any of the files. (Tr. 1901.) Juror No. 7 further stated that all of the file names only said "Exhibit." (Tr. 1902.) No other jurors observed what was on the flash drive and Juror No. 7 did not relay any information to any other jurors, except that he could not locate the video. The court instructed Juror No. 7 to "disregard anything that [he] may have seen or viewed on that flash drive," to which he agreed. (Tr. 1905.) Defense counsel then moved the court for a mistrial, "given the potential for prejudice that could potentially inure to [Kielonte] given the jurors' access to records which include but are not limited to ODRC records[.]" (Tr. 1910.) The trial court, however, allowed the jury to continue its deliberations and reach a verdict.

{¶ 38} The jury found Kielonte guilty of Counts 1-15 and the accompanying firearm specifications. The court found Kielonte guilty of Counts 16-17, and all the firearm specifications, notice of prior conviction, and repeat violent offender specifications.[9]

{¶ 39} The court sentenced Kielonte to "a minimum prison term of 3 life sentences to run consecutive to each other and consecutive to 13.5 years on the firearm" specifications. (Judgment Entry, Aug. 31, 2023.) The court merged, for purposes of sentencing, Counts 1 and 2, Counts 3 and 4, Counts 5 and 6, Counts 8

---

[9] At the close of the state's case-in-chief, the trial court granted Deandre's Crim.R. 29 motion for acquittal on all charges except for the two counts of HWWUD. At the conclusion of trial, the court found Deandre guilty of the HWWUD counts with the attached firearm specifications.

and 9, Counts 10 and 13,Counts 11 and 14, Counts 12 and 15, and Counts 16 and 17. The court ordered that Count 10 merges with Count 1, Count 11 merges with Count 3, and Count 12 merges with Count 1. The state elected to proceed with sentencing on Counts 1, 3, 5, 7, 8, and 16. The court granted Kielonte 1,124 days of jail-time credit. The court ordered Kielonte to pay half of the court costs and fees, or perform court community work service within the confines of the prison and with the warden's approval in lieu of cash payment and waived the fines.

{¶ 40} Kielonte now raises the following eight assignments of error for review, which shall be discussed together and out of order where appropriate.

> **Assignment of Error I:** The trial court erred by denying [Kielonte]'s motion for mistrial when prejudicial evidence that was outside the record was submitted to the jury during deliberations in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

> **Assignment of Error II:** The trial court erred by admitting the testimony of the Forensic Video Specialist over defense objection where the witness offered opinion and expert testimony without complying with Crim.R. 16, Evid.R. 702, and without being qualified or declared as an expert by the court.

> **Assignment of Error III:** The trial court erred by denying [Kielonte]'s motion for a mistrial where a witness refused to testify before the jury the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

> **Assignment of Error IV:** The trial court erred by admitting exhibits over defense objection in violation of Evid.R. 401, 402, 403, 702, 801 and 901 and which deprived [Kielonte] of his constitutional rights to due process and a fair trial.

> **Assignment of Error V:** [Kielonte] was deprived of due process and a fair trial because potentially exculpatory evidence was lost, destroyed, or missing.

**Assignment of Error VI:** The trial court erred when it denied [Kielonte]'s motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

**Assignment of Error VII:** [Kielonte]'s convictions are against the manifest weight of the evidence.

**Assignment of Error VIII:** [Kielonte]'s federal and state constitutional rights were violated where the State misrepresented to the jury during opening statements that [Kielonte] had tampered with and removed his ankle bracelet which was contrary to the record evidence.

## II. Law and Analysis

### A. Mistrial

{¶ 41} The decision to grant or deny "a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001), citing Crim.R. 33; *State v. Sage*, 31 Ohio St.3d 173, 382, 510 N.E.2d 343 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. "The granting of a mistrial is necessary only when a fair trial is no longer possible." *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 580 N.E.2d 1 (1991).

### 1. Unadmitted Evidence Submitted to the Jury

{¶ 42} In the first assignment of error, Kielonte, relying on *State v. Westwood*, 4th Dist. Athens No. 01CA50, 2002-Ohio-2445, argues that he was prejudiced when the jury, during deliberations, was exposed to Court's Ex. 5, which

was not admitted as evidence. Court's Ex. 5 consisted of a flash drive containing information relevant to when the case was charged as a capital offense. There is a key difference, however, between *Westwood* and the matter before us.

**{¶ 43}** In *Westwood*, the appellant was on trial for drug possession. A bag of marijuana (unadmitted evidence), allegedly purchased from either the appellant or from someone else at his home, was mistakenly given to the jury during deliberations. There was no question that the jury viewed the unadmitted evidence. *Id.* at ¶ 25. Defense counsel then moved for a mistrial. The trial court denied the motion and "instructed the jury (1) not to consider that exhibit for 'any purpose'; and (2) not to draw any inference from the exhibit or to speculate as to the reason behind the court's instruction to disregard the evidence." *Id.* at ¶ 11. On appeal, the Fourth District Court of Appeals concluded that a mistrial was warranted because the unadmitted exhibit "suggested that appellant also trafficked in drugs," there was a great danger of prejudice in the jury being exposed to "other criminal acts unrelated to the particular issued involved in the trial." *Id.* at ¶ 38.

**{¶ 44}** Whereas in the instant case, the above concerns are absent. Here, the jurors did not view the contents of the unadmitted exhibit — Court's Ex. 5. The jury was not exposed to anything that could suggest Kielonte was involved in other criminal acts. Rather, only Juror No. 7. viewed the flash drive and he opened only one PDF file, but did not read anything on it. Additionally, Juror No. 7 did not recall any of the names of the exhibits on the flash drive or any of the content on the PDF file he opened, and the other jurors did not view any of the contents on the flash

drive. Furthermore, the trial court instructed Juror No. 7 to "disregard anything that [he] may have seen or viewed on that flash drive," to which he agreed. (Tr. 1905.)

{¶ 45} While it is undisputable that Court's Ex. 5 was included with the trial exhibits in error, we find that it does not constitute reversible error. In the instant case, the record demonstrates that no harm came to Kielonte by way of the momentary possession of Court's Ex. 5 by the jury. The court conducted a voir dire of Juror No. 7 as to whether he reviewed the contents of the exhibits and was assured he had not. Therefore, Kielonte has not demonstrated such prejudice as to warrant a mistrial.

{¶ 46} Accordingly, the first assignment of error is overruled.

## 2. Billingsley's Unwillingness to Testify

{¶ 47} In the third assignment of error, Kielonte argues that he was prejudiced when Billingsley refused to testify in front of the jury and was held in contempt by the trial court because this would make the jury infer that he was intimidating or threatening Billingsley. Kielonte contends that a mistrial should have been granted because Billingsley informed the state in advance that he was in fear for his life and would not testify. We note that Kielonte does not cite any case law to support this assignment of error. An appellate court may disregard an assignment of error if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A). *See* App.R. 12(A)(2). "'If an argument exists that can support this assigned error, it is not this court's duty to root it out.'"

*Siemientkowski v. State Farm Ins. Co.*, 8th Dist. Cuyahoga No. 85323, 2005-Ohio-4295, ¶ 23, quoting *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028 (May 6, 1998).

{¶ 48} Even if we were to address the merits of this assigned error, we find Kielonte's argument unpersuasive. Here, Billingsley refused to answer any questions when he was initially called to testify. He was then held in contempt, but changed his mind and later testified at trial. Other than speculating what the jury inferred, Kielonte fails to demonstrate how this resulted in an unfair trial.

{¶ 49} Therefore, the third assignment of error is overruled.

### B. Evidentiary Issues

{¶ 50} The admission or exclusion of evidence lies in the trial court's sound discretion and "'unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984), quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

### 1. Forensic Video Specialist's Testimony

{¶ 51} In the second assignment of error, Kielonte argues that the state failed to present Ciula as an expert witness and failed to comply with the requirements for admitting his testimony under Crim.R. 16 and Evid.R. 702.

{¶ 52} Here, the state intended to introduce Ciula's testimony, a forensic video specialist, but did not seek to qualify him as an expert witness. On October 19, 2022, the state shared with defense counsel a report Ciula made that contained

various still images and "an addendum [that] talks about work that was done and extractions that were made." (Tr. 851.) On October 25, 2023, the fifth day of trial, defense counsel objected to the report, noting that it was untimely under Crim.R. 16, which provides that expert reports shall be disclosed no later than 21 days prior to trial.

{¶ 53} Defense counsel and the state had a lengthy discussion with the trial court regarding whether it was expert or lay testimony. The state described it as

> additional things done with that same video where he made annotations. What he would do is at various points he would kind of zoom in and track a person. For the bar video, he made sequences so that instead of having to watch eight camera angles to follow a person, he would be able to track that person throughout camera angles. And then he made comparisons with respect to an individual that was seen at Izzo's. And then showing consistency or comparisons to an individual seen on that second video from Lorain.

(Tr. 856.) The state argued that Ciula's testimony was demonstrative and the witness was not "going to be rendering any opinions." (Tr. 857.) Rather, the state intended to question "Ciula on observations that he made on the video." (Tr. 862.)

{¶ 54} Defense counsel moved to exclude Ciula's testimony in its entirety, arguing that it was expert testimony. Defense counsel stated:

> We have an unmolested unenhanced video which should play, which were made available in its entirety to the parties well in advance. And you ask a detective what do you see there, right? I don't need some lab tech making enhancements on videos that we don't know what was enhanced from its original value, how it was enhanced. They're looping stuff, drawing arrows on things, and then suggesting that he has some sort of superior knowledge than a detective does when he plays a video and says this is something of consequence, this is something that we think is relevant to an issue in this case.
>
> * * *

[W]e have no problem * * * with any of the * * * raw video.

* * *

Or photos or stills of the raw. And if [Ciula] wants to go up there and he wants to point to something, that's great, right. But the presentation, as I understand it that will be offered, was manipulated. And what we would suggest to the Court is it's as if we are getting something new for the first time and that's not fair, particularly when you are talking about at the very end of it there is an analysis of jeans and fading in jeans, which is clearly enhanced in some manner and purports to connect [Kielonte], * * * from Izzo's to the scene and it is catastrophic.

* * *

And we don't even have those jeans in evidence. So to suggest that this is harmful to us, there's no doubt. It is, as we would say, the first time that we have seen this because it is as enhanced.

* * *

The other thing I would say is I would challenge the [state] to provide a CV that they have provided in discovery to us of someone else that they don't intend to qualify as an expert under [Evid.R.] 702. We were served a copy of Ciula's CV. You don't do that unless it's an expert. I didn't get a CV from any of the detectives from before or any other lay witnesses. The reason why you provide a CV, your curriculum vitae, is because you have to qualify someone. And to do so, you have to go through their education, their experience, how many times they have addressed others in continued education. And that's what's laid out in [Ciula's] CV, which is provided contemporaneous with the October 19 receipt of the report itself.

(Tr. 858-859, 868-870.)

{¶ 55} Ultimately, the court overruled Kielonte's objections and allowed the testimony. In reaching its decision, the court stated:

I do not have necessarily an objection to the use of demonstrative evidence. And I understand your arguments, [defense counsel], that these, as you termed it, enhanced photos or videos in your argument constitute new or additional ones, but I disagree. I think they are just

— as indicated, they're enhanced and this is for demonstrative purposes.

I am mindful of testimonial versus admissible evidence. I do agree that he should not be able to render any type of an expert opinion. And, again, * ** I am not making any conclusion at this point if that report would be admissible if offered.

* * *

So the thought I have is just to conclude today's testimony, give you the opportunity to watch that video.

(Tr. 870, 873.)

{¶ 56} Upon reconvening the next day, the court stated:

With respect to the Ciula testimony video, I am going to overrule your motion or objection. * * * I don't believe it to be any new discovery. Even if it were, arguably having it four days before the jury was sworn in, we could have discussed it at that point in time. That would have been one of the least restrictive sanctions, which is to provide you some additional time. Certainly I will give you broad discretion with respect to cross-examination on any of his testimony.

(Tr. 885.)

{¶ 57} During direct-examination, Ciula testified that he has been a forensic video specialist with the Cleveland Police for the last 11 years. He is a "certified forensic video examiner and a certified forensic video technician from LEVA, the Law Enforcement and Emergency Services Video Association, and from the IAI, the International Association for Identification." (Tr. 1018.) He enlarged the Lorain video in this case because of distance between the cameras and the individuals. Ciula testified that to enlarge the video,

you have to focus on a particular section of that given frame. * * * So in that process, one of the first steps we will do is take that time stamp that we talked about earlier, that time/date stamp, make a copy of that,

and crop it down so there's nothing seen, but that time/date stamp and put that over whatever enlargement we are doing.

Because once I start doing that enlargement, the original time/date stamp goes away. I am focusing on the center of the frame. That thing in the corner is no longer there. So by taking that exact synchronized stamp and overlaying it in a part of the frame, we could still maintain seeing exactly what time we are talking about, what date we are talking about, but to see in closer as to what's occurring.

(Tr. 1029.)

{¶ 58} Defense counsel renewed its objection when the state sought to have Ciula describe what the individuals were wearing in the video. Despite explaining that the witness would not be rendering any opinions, the state asked Ciula, "[W]hat observations did you make about the clothing that you thought were relevant to your work on this case?" (Tr. 1041-1042.) Ciula replied, "That it was apparent that on the front of the jeans there are two light areas * * * one on each leg [and] * * * two on each leg from the back[.]" (Tr. 1042.) Shortly thereafter, the state asked Ciula to describe the difference between the original and transcoded videos and "[w]hich format is better for presentation here based upon your training and experience?" (Tr. 1054.)

### a. Crim.R. 16

{¶ 59} Crim.R. 16(K) requires that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial. The 21-day "period may be modified by the court for good cause shown, which does not prejudice any other party" and the "[f]ailure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K).

"""[T]he purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.""" *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 48, quoting *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55; *see also State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.).

{¶ 60} Kielonte first argues that Ciula's testimony should have been precluded under Crim.R. 16(K) because his expert report was disclosed less than 21 days before trial. Crim.R. 16(K), however, provides the trial court with discretion to modify the 21-day period for good cause shown, which does not prejudice the other party. In the matter before us, the trial court exercised its discretion and found that Cuila's report was not new discovery, and even if it was, it could have been discussed when it was received, which was four days before the jury was sworn in. The court noted that it would give defense counsel broad discretion with respect to cross-examination on any of Ciula's testimony. Based on the foregoing, we decline to find noncompliance with Crim.R. 16.

### b. Evid.R. 702

{¶ 61} Evid.R. 702 provides that

[a] witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  * * *

{¶ 62} Kielonte next argues that Ciula's testimony was improperly admitted expert testimony because the state did not qualify Ciula as an expert at trial as set forth in Evid.R. 702.

{¶ 63} Here, Ciula testified that that he enlarges the video by making a copy of the time stamp, cropping the video so there is nothing seen, and overlaying it in a part of the frame, so that this closer view as to what is occurring in the video can be observed along with the exact time.  (Tr. 1029.)  Ciula also testified in some instances it can be a tedious process to go through each camera from each location, "[s]o if [he] see[s] things that [he] believe[s] are consistent, [he] will sometimes put them into a single video that shows comparison points between the two video locations, points out exactly what [he is] looking at * * * so it can be observed and also tied to any other identifiers."  (Tr. 1068.)  This video, which is state's exhibit No. 344, contained annotations that explained where the video was coming from (either Izzo's or the initial location) and "arrows pointing at [Ciula's] points of observation that [he] found to be significant."  (Tr. 1068.)  He enlarged the video anywhere from "80 percent to 400 percent and * * * brought up [the light] anywhere between zero and 2 percent."  (Tr. 1100.)  Clearly, this testimony "relates to matters beyond the

knowledge or experience possessed by lay persons" and is based on technical or other specialized information. Evid.R. 702.

{¶ 64} We further find that Ciula's qualifications, as stated in this case, rise to the level of expert in his field. Ciula stated that he has been a forensic video specialist with the Cleveland Police for the last 11 years and that he is a "certified forensic video examiner" and "a certified forensic video technician." (Tr. 1018.) Moreover, he stated that his CV includes "more than 12" judges that qualified him as "expert in forensic audio and video analysis." (Tr. 1078.) Ciula further stated that he testified in excess of 50 times, which this court previously acknowledged in *State v. Fields*, 8th Dist. Cuyahoga No. 107971, 2020-Ohio-4740. "Ciula has testified as an expert forensic video specialist in multiple cases in the Cuyahoga County Common Pleas Court." *Id.* at ¶ 61, citing *State v. George*, 8th Dist. Cuyahoga No. 103708, 2016-Ohio-7886; *State v. McMiller*, 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844; *State v. Warmus*, 8th Dist. Cuyahoga No. 99962, 2014-Ohio-928.

{¶ 65} In *Fields*, the defendant argues that his trial counsel "'was ineffective for failing to move to strike the testimony of [Ciula], in whole, as said testimony was expert witness testimony and [Ciula] was never tendered as an expert witness.'" *Id.* at ¶ 55. We found that his testimony was expert testimony under Evid.R. 702 because it "'relate[d] to matters beyond the knowledge or experience possessed by lay persons'" and Ciula's qualifications rise to the level of expert in his field. *Id.* at ¶ 60-61. We concluded that defense counsel was not ineffective because the defendant could not demonstrate prejudice since Ciula would have qualified as an expert had

the state proffered him as one. *Id.* at ¶ 63. *Compare State v. Scott*, 8th Dist. Cuyahoga No. 112325, 2024-Ohio-975 (where this court reviewed the admission of Ciula's testimony for plain error under Evid. R. 701 because defense counsel did not challenge the testimony as improper lay witness testimony. We found that "it was an error to allow Ciula to testify about the contents of the video," but concluded "the admission of Ciula's testimony was harmless" because the "jury was presented with the video and had an opportunity to review it and determine for themselves what it contained." *Id.* at ¶ 76-77.). Similarly, it was error to allow Ciula to testify about the contents of the video and render his opinion without first qualifying him as an expert.[10]

{¶ 66} Because portions of the testimony elicited by the state in this case were expert testimony, Ciula's expert testimony was improperly admitted. We note, however, that our analysis does not end here. The Ohio Supreme Court has held that we must next consider the harmless error standard under Crim.R. 52 to determine whether the error was reversible. *Boaston* at ¶ 60, citing *State v. Walls*, 2018-Ohio-329, 104 N.E.3d 280 (6th Dist.), and *State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985; *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 115. Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In order to prejudice a defendant's substantial rights under Crim.R.

---

[10] We note that Ciula's status as an expert in his field does not automatically render him an expert every time he testifies in court. This is a determination made based on the circumstances in each case.

52, the error "'must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 99 Ohio St. 3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 67} Applying that analysis here, we fail to see how Kielonte was prejudiced by the admission of this evidence. The state acknowledges and we agree that to "the extent that any portion of Ciula's testimony admitted by the trial court could be construed as expert opinion testimony, harmless error analysis would apply, and the overwhelming evidence of Defendant's guilt means that the outcome could not have been [different]." Indeed, there was eyewitness testimony identifying Kielonte as the shooter and his ankle bracelet placed him at the scene of the crime, corroborating the witnesses' testimony. Furthermore, the jury was presented with the video and had an opportunity to review it and determine for themselves what it contained. Additionally, defense counsel cross-examined Ciula regarding his answers and pointed out issues of concern, for instance, that he is not an expert in denim. The remaining evidence adduced by the state established his guilt beyond a reasonable doubt. Thus, based on the testimony presented in this case, Kielonte has failed to establish that the admission of Ciula's testimony was more than harmless error, i.e., an error of such magnitude that the outcome of the trial would have been different if it had not occurred.

{¶ 68} Accordingly, the second assignment of error is overruled.

## 2. State's Exhibit Nos.: 216, 240, 242, 243, 343, and 344

{¶ 69} In the fourth assignment of error, Kielonte contends the trial court abused its discretion when it admitted the following exhibits, over defense counsel's objection: (1) state's exhibit No. 216 — Coley's 911 call; (2) state's exhibit No. 240 — Sergeant Dial's body camera footage; (3) state's exhibit No. 242 — Officer Hejny's body camera played for Paramedic Hyde; (4) state's exhibit No. 243 — Detective Florentz's body-camera footage; (5) state's exhibit No. 343 — sequence video from Izzo's Café; and (6) state's exhibit No. 344 — Ciula's video sequence compilation.

{¶ 70} Kielonte first argues that Coley's 911 call should have been excluded because it was not properly authenticated. Evid.R. 901(A) provides that a party must properly authenticate documentary evidence as a prerequisite to admissibility. By way of illustration, Evid.R. 901(B) provides that evidence may be properly authenticated by testimony of witness with knowledge that "a matter is what it is claimed to be." While Coley initially denied calling 911, after hearing the call, he testified that it "sounded like me" and "I made that call out of panic thinking I was doing the right thing." (Tr. 704.) Furthermore, when asked his name on the call, the male states "Arsenio Coley." Based on the foregoing, Coley's 911 was authenticated and properly admitted into evidence.

{¶ 71} Kielonte next challenges the admissibility of state's exhibit Nos. 343 and 344 — Ciula's video comparisons, incorporating his arguments from the second assignment of error. Based on our disposition of the second assignment of error, we find that the trial court did not abuse its discretion when it admitted these videos.

{¶ 72} Kielonte next challenges the body-camera videos marked as state's exhibit Nos. 240, 242, and 243, arguing they were not properly authenticated by the officers who recorded the video and contained hearsay. Concerning state's exhibit No. 240, Det. Estergall testified that while this was Sgt. Dial's body-camera video, he could be viewed on the video "on the left" of the screen. (Tr. 561.) Det. Estergall further testified that exhibit No. 240 reflected what he observed on scene the night of the homicide. Similarly, with state's exhibit No. 242, Paramedic Hyde also testified he was in the video and explained he could be viewed "leav[ing] the corner of the building" in the backyard. (Tr. 1204.) Finally, with state's exhibit No. 243, Det. Florentz testified that this was his own body camera from that morning. Det. Florentz went on to describe the video in detail and stated that the video reflected a "true and accurate representation" of his involvement that night. (Tr. 616.) Keeping Evid.R. 901(B) in mind, firsthand observations of scenes are sufficient to authenticate images depicted on video. *See Cleveland v. Greear*, 8th Dist. Cuyahoga No. 108190, 2020-Ohio-29, ¶ 17 (holding that a victim's testimony that a police body camera video accurately depicted the events that occurred was sufficient to authenticate the video). Based on the foregoing, we find that the body-camera videos were properly authenticated.

{¶ 73} With regard to the hearsay claim, Kielonte argues that the hearsay statements on the videos violated his confrontation clause rights. The trial court, however, properly overruled Kielonte's hearsay objections recognizing that any utterances captured on these videos were not offered for the truth of the matter

asserted. These exhibits were presented to provide the jury with an actual view of the initial police response to the scene and the discovery of the three victims. Furthermore, there were no statements of a testimonial nature on these videos, only "excited utterances" or "present-sense impressions," both of which are exceptions to the hearsay rule. Evid.R. 803(1)-(2). Moreover, a review of the record reveals that the state redacted each of these exhibits to ensure that the jury not be exposed to improper hearsay, and the portions admitted by the trial court and viewed during trial contained no improper hearsay.

{¶ 74} Therefore, the fourth assignment of error is overruled.

### C. Preservation of Evidence

{¶ 75} In the fifth assignment of error, Kielonte argues his due process rights were violated because "the crime scene log was missing and the body camera of several responding officers was not functioning."

{¶ 76} "A defendant's due process rights are violated if the prosecution fails to preserve materially exculpatory evidence." *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 9, citing *State v. Lewis*, 70 Ohio App.3d 624, 634, 591 N.E.2d 854 (4th Dist.1990). The failure to preserve evidence that is merely potentially useful, however, does not amount to a due process violation unless bad faith is shown. *Id.*, citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). "Evidence is materially exculpatory if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different.'" *Id.* ¶ 10, quoting *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1989), paragraph five of the syllabus.

{¶ 77} In drawing the distinction between "materially exculpatory" and "potentially useful," the Ohio Supreme Court determined that "[i]f the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 254, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 10, citing *Youngblood*. "Thus, when evidence is only potentially useful, its destruction does not violate due process unless the police acted in bad faith when destroying the evidence." *State v. Miller*, 2016-Ohio-7606, 73 N.E.3d 989, ¶ 80 (8th Dist.), citing *Simmons*, citing *Youngblood*; *State v. Miller*, 161 Ohio App.3d 145, 2005-Ohio-2516, 829 N.E.2d 751 (2d Dist.).

{¶ 78} "'[B]ad faith' generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of the fraud. It also embraces actual intent to mislead or deceive another." *State v. Durham*, 8th Dist. Cuyahoga No. 92681, 2010-Ohio-1416, ¶ 13, quoting *State v. Smith*, 2d Dist. Montgomery No. 20247, 2005-Ohio-1374, ¶ 7. The defendant bears the burden of demonstrating the exculpatory nature of the unavailable evidence. *State v. Sowell*, 8th Dist. Cuyahoga No. 90732, 2008-Ohio-5875, ¶ 28, citing *State v. Birkhold*, 5th Dist. Licking No. 01CA104, 2002-Ohio-2464.

{¶ 79} Here, Kielonte argues that the missing crime-scene log may have included "critical" information. The information in the crime-scene log, however, was preserved through the information documented by Det. Echols. When asked if his investigation included "a lot of the same information, if not all of the same information, that would be included on the crime scene log except for individual officer names," Det. Echols replied, "[c]orrect." (Tr. 1634.) Det. Echols testified that he used the crime-scene log to ensure the thoroughness of his report. Det. Echols further testified that his original investigation report documented the police, EMS, medical examiner, and homicide unit personnel who were present at the scene.

{¶ 80} Based on the foregoing, Kielonte fails to demonstrate how the crime-scene log would have been material to the case. The mere "potential" of any useful evidence being discovered had the crime-scene log been preserved is insufficient to satisfy his burden. Kielonte also cannot demonstrate that the failure to preserve the crime-scene log was in bad faith. At trial, defense counsel stated that he has a spoliation issues with the missing crime-scene log, but did not think "it was deliberately done[.]" (Tr. 538.)

{¶ 81} With regard to Officer Estergall's body camera, Officer Estergall believed that he recorded his response to the scene but could not explain why it was not functioning. The crime scene and police response were captured, however, by other responding officers, which were provided to Kielonte. Officer Estergall testified to the content of Sergeant Dial's body camera footage because they were together for much of the time and Officer Estergall can be observed in the video.

Officer Estergall testified that the body camera footage depicted the scene as he remembered it. Officer Estergall's testimony establishes that there was no lost evidence or destroyed evidence by virtue of Officer Estergall's malfunctioning body camera.

{¶ 82} Accordingly, the fifth assignment of error is overruled.

### D. Sufficiency of the Evidence

{¶ 83} In the sixth assignment of error, Kielonte argues trial court erred when it denied his Crim.R. 29(A) motion because the evidence was insufficient to establish the elements for aggravated murder, aggravated burglary, aggravated robbery, kidnapping, murder, felonious assault, and HWWUD.

{¶ 84} We note that "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54,

2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 85} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 86} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id*. at ¶ 16.

{¶ 87} Kielonte first argues that his identification as the shooter was never established by highlighting the fact that the eyewitnesses were highly intoxicated at the time of shootings. While Abdulhalim initially identified Deandre, in court, as the shooter, she corrected herself after she was able to observe both Kielonte and Deandre while they were standing. Abdulhalim testified that she was within a few

feet from Magana when she witnessed Magana's murder and then witnessed Meeks's murder outside as she ran to her friend's house. She was able to describe their killer and identified Kielonte by his name. And while Coley refused to provide any significant testimony at trial, in his 911 call that morning he told police that "Tae" shot Magana and then started shooting everyone who was a witness. Billingsley identified Kielonte as the person who confronted Tursivio by his car just before he heard a gunshot. Holbert identified Kielonte as the person she heard arguing with Magana and threatening people when she heard the shot from the kitchen. A reasonable factfinder could have concluded that the combined testimony of these four witnesses was sufficient to identify Kielonte as the shooter.

{¶ 88} Moreover, Kielonte's own admission and the corroborative evidence introduced by the state places Kielonte at the scene of the crime. He admitted he was in the area, and GPS data pinpoints him at the location of each murder. Video surveillance depicts that Meeks was murdered by an individual with distinctive white markings on their jeans. Kielonte can be observed wearing similar jeans hours earlier at Izzo's. Additionally, gunshot residue was found on the sleeves of Kielonte's black Levi's coat, which can be observed in the video. When this evidence is viewed in a light most favorable to the state, any rational trier of fact could have found that Kielonte shot and killed Magana, Meeks, and Tursivio.

{¶ 89} Kielonte next argues the state did not present sufficient evidence that he trespassed by force, stealth, or deception that is required to sustain the aggravated burglary convictions. He further argues that there is no evidence that he

attempted or committed a theft offense. Kielonte fails to acknowledge, however, that the Supreme Court of Ohio has held "that even assuming a lawful initial entry, a defendant's privilege to remain in a private residence terminates if he assaults a resident." *State v. Mitchell*, 8th Dist. Cuyahoga No. 94287, 2010-Ohio-5775, ¶ 12, citing *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987); *see also State v. Miller*, 8th Dist. Cuyahoga No. 109214, 2020-Ohio-5431; *State v. Johnson*, 8th Dist. Cuyahoga No. 97698, 2012-Ohio-3812; *State v. Willis*, 8th Dist. Cuyahoga No. 97077, 2012-Ohio-2623; *State v. Hill*, 8th Dist. Cuyahoga No. 95379, 2011-Ohio-2523. The *Steffen* Court ruled that "a violent crime committed in the residence of one other than the defendant always constitutes aggravated burglary (i.e., the commission of the crime terminates the privilege to remain in the home)." *Mitchell* at ¶ 15.

{¶ 90} Here, Abdulhalim's testimony established that while Kielonte was arguing with Magana about money at the party, he pulled out a gun and demanded everyone to strip. Abdulhalim testified that "strip" meant Kielonte "was going to try and rob us." (Tr. 912.) In accordance with *Steffen*, even if Kielonte lawfully gained entry to Magana's apartment, his privilege terminated once he demanded everyone's money and shot Magana. Under the sufficiency of the evidence standard of review, this evidence, if believed, supports Kielonte's aggravated burglary and aggravated robbery convictions.

{¶ 91} Therefore, the sixth assignment of error is overruled.

### E. Manifest Weight of the Evidence

{¶ 92} In the seventh assignment of error, Kielonte argues that his convictions are against the manifest weight of the evidence.

{¶ 93} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 94} As this court has previously stated:

The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? Wilson at id. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact

finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 95} While Kielonte attacks the credibility of the state's witnesses and the uncertainty of the evidence, he does not demonstrate how the jury clearly lost its way and created such a manifest miscarriage of justice. Abdulhalim, Billingsley, Coley, and Holbert's testimony as to Kielonte's actions that night were consistent. Abdulhalim and Billingsley testified that Kielonte called for her as she was walking to Magana's apartment. The video supports this testimony. Abdulhalim, Coley, and Holbert provided consistent testimony about the argument followed by gunshots inside Magana's apartment. Billingsley and Abdulhalim's testimony as to what occurred outside the apartment is consistent with surveillance video on Lorain and the GPS data. Coley's 911 call to police that morning identifies "Tae" as the person who shot Magana and then was trying to kill everybody in the house because they were witnesses.

{¶ 96} Thus, after reviewing the entire record, weighing the inferences and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Kielonte's convictions are not against the manifest weight of the evidence.

{¶ 97} Accordingly, the seventh assignment of error is overruled.

## F. The State's Opening Statement

{¶ 98} In the eighth and final assignment of error, Kielonte contends that he was denied the right to a fair trial because the state misspoke during its opening statement. Specifically, Kielonte takes issue with following statements: "police arrest him that same day, having cut off his ankle monitor * * * [he] doesn't really have good explanation for why he's speeding to the east side at 4:00 a.m., cut off his monitor." (Tr. 517-518.)

{¶ 99} Courts have previously held that

> "In general, a statement made by counsel of the evidence that he expects to introduce is not reversible error unless it appears that counsel made the statement in bad faith, even if it turned out that such evidence was incompetent." (Internal quotations omitted.) *State v. Neal*, 10th Dist. No. 95APA05-542, 1996 Ohio App. LEXIS 199, at *34, quoting *State v. Lipker* (1968), 16 Ohio App.2d 21, 25, 241 N.E.2d 171. *See, also, State v. Simonson* (Dec. 31, 1991), 3d Dist. No. 2-91-8, 1991 Ohio App. LEXIS 6483 (failure of prosecution to prove some fact claimed in opening argument does not warrant reversal on grounds that defendant was denied fair trial unless statement appears to be made in bad faith and also was of such a nature, in and of itself, as to be manifestly prejudicial).

*State v. Riffle*, 9th Dist. Medina No. 09CA0056-M, 2010-Ohio-2812, ¶ 10.

{¶ 100} Here, defense counsel immediately brought the misstatement to the jury's attention and proved the state was wrong to have claimed Kielonte cut off his ankle monitor. The prosecutor also admitted to the jury through Ice's direct examination that he had made this mistake. When the prosecutor asked Ice on direct examination whether he would have been mistaken if he had stated "at some point earlier in this trial that something happened to that ankle monitor prior to

[Kielonte] being arrested," Ice replied, "[y]ou would have." (Tr. 1257.) Based on these circumstances, Kielonte has failed to demonstrate that the state acted in bad faith and this isolated misstatement prejudicially affected the outcome of his case.

{¶ 101} Therefore, the eighth assignment of error is overruled.

{¶ 102} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR